**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLORADO**

| | |
|---|---|
| Civil Action No. _____ | ) |
| | ) |
| DOUGLAS A. KOPPS, derivatively on behalf of | ) |
| Nominal Defendant The Spectranetics | ) |
| Corporation, | ) |
|            Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| EMILE J. GEISENHEIMER, DAVID G. | ) |
| BLACKBURN, R. JOHN FLETCHER, | ) |
| MARTIN T. HART, JOSEPH M. RUGGIO, | ) |
| M.D., JOHN G. SCHULTE and CRAIG M. | ) |
| WALKER, M.D. | ) |
|            Defendants, | ) |
| | ) |
| and | ) |
| | ) |
| THE SPECTRANETICS CORPORATION, | ) |
| | ) |
|            Nominal Defendant. | ) |

---

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

---

Plaintiff Douglas A. Kopp ("Plaintiff" or "Kopp") by his attorneys, submits this Verified Shareholder Derivative Complaint.

## NATURE OF THE ACTION

1.     This is a shareholder derivative action brought by Plaintiff Kopp for the benefit of Nominal Defendant The Spectranetics Corporation ("Spectranetics" or the "Company") against Defendants Emile J. Geisenheimer, David G. Blackburn, R. John Fletcher, Martin T. Hart, Joseph M. Ruggio, M.D., John G. Schulte and Craig M. Walker, M.D. for violations of their

fiduciary duties owed to Spectranetics from at least April 19, 2007 through the present (the "Relevant Period").[1]

2.      On September 4, 2008, Spectranetics shocked its shareholders and the market when it announced that it was jointly served by the Food and Drug Administration ("FDA") and U.S. Immigration and Customs Enforcement ("ICE") with a search warrant issued by the United States District Court, District of Colorado.   The search warrant requested information and correspondence relating to: (1) the promotion, use, testing, marketing and sales regarding certain of the Company's products for treatment of in-stent restenosis, payments made to medical personnel and an identified institution for this application; (2) the promotion, use, testing, experimentation, delivery, marketing and sales of catheter guidewires and balloon catheters manufactured by certain third parties outside of the United States; (3) two post-market studies completed during the period from 2002 to 2005 and payments to medical personnel in connection with those studies; and (4) compensation packages for certain of the company's personnel.   In addition to the search warrant, the Company confirmed that NASDAQ halted trading of Spectranetics common stock pending this announcement but after its stock price suffered a decline of 47% on very heavy trading.   The Company is now also being investigated by the U.S. Securities and Exchange Commission ("SEC").

3.      In addition to the search warrant and investigations by the FDA, ICE and SEC, the Company has been sued by its former Director of Marketing who alleges he was fired after bringing facts of alleged illegal marketing of the Company's lasers and stents to senior

---

[1]Because Individual Defendants have failed to take action to remedy the breaches of fiduciary duties that occurred between at least April 19, 2007 and September 4, 2008, the Relevant Period continues through this day instead of ceasing on September 3, 2008, the day before the public became aware of the wrongdoings at the Company.

managements' attention.  The former Director of Marketing further alleges that the Company was illegally and "extensively" marketing its laser and catheters for uses that had not been approved by the FDA; that the Company failed to report to the FDA that tests found its laser "caused significant damage" to stents the Company was using in the clinical trial; and that the Company illegally tested several products on patients without FDA approval.  Moreover, the former Director of Marketing alleges that he notified Defendant Schulte of Spectanetics' alleged violations in an email dated April 1, 2008.

4.     On July 29, 2008, Spectranetics, through its senior management including Defendant John G. Schulte, held a conference call with analysts, shareholders and investors.  Despite touting the Company's financial results, including alleged surging of revenue across all product lines, no mention was made of the internal turmoil and alleged illegal acts further described herein.

5.     As a result of this wrongful course of conduct, the Company has experienced significant damages and will need to expend considerable sums of money, including the following: (a) costs incurred to carry out internal investigations, including legal fees paid to outside counsel, accounting firms and consultants; (b) costs incurred in responding to subpoenas and requests for information from government agencies, including the FDA, ICE and SEC; (c) costs incurred from potential fines in connection with governmental investigations; and (d) loss of goodwill.

6.     Throughout the Relevant Period, the Individual Defendants knew or recklessly disregarded that their public statements concerning Spectranetics' business and operations were materially false and misleading.  Specifically, this Complaint alleges that the Individual Defendants failed in their fiduciary duties to exercise a high degree of care, loyalty and diligence

in the management and administration of the affairs of the Company in a fair, just, honest and equitable manner; failed to implement adequate oversight, regulatory and supervisory controls and to act in furtherance of the best interests of Spectranetics and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1332(a)(1) in that Plaintiff and Individual Defendants are citizens of different states and the amount in controversy exceeds $75,000.00 exclusive of interest and costs.

8.      This action is not a collusive one designed to confer jurisdiction upon a court of the United States that it would not otherwise have.

9.      Venue is proper in this district pursuant to 28 U.S.C. §1391(a) because a substantial portion of the transactions and wrongs complained of herein occurred in this district. Further, Individual Defendants either reside or participated in board of director meetings or maintain executive offices in this district and have received substantial compensation in this district by engaging in numerous activities and conducting business in this district. Further, Spectranetics maintains its principal place of business in this district.

## PARTIES

10.     Plaintiff Douglas A. Kopp, as set forth in the attached Verification, is and was during the Relevant Period, a shareholder of Spectranetics. Plaintiff Kopp is a citizen of Michigan.

11.     Nominal Defendant Spectranetics is a Delaware Corporation with its headquarters located in Colorado Springs, CO.

12.    Nominal Defendant Spectranetics develops, manufactures, markets, and distributes single-use medical devices used in minimally invasive surgical procedures within the cardiovascular system using its Excimer laser technology.   The Company's Excimer laser technology delivers relatively cool ultraviolet energy to remove arterial blockages, including plaque, calcium, and thrombus.   It offers a range of proprietary laser devices designed for indications, including peripheral laser atherectomy in the upper and lower leg; and coronary laser atherectomy. The Company's peripheral laser atherectomy products include TURBO Elite Catheters for peripheral laser atherectomy; TURBO-Booster for the TURBO elite laser catheters facilitating directed laser ablation of blockages in the main arteries at or above the knee; and Quick-Cross Support Catheter that supports catheters for use in the cardiovascular system to support and assist standard guidewires to facilitate initial crossing of the blockage.   Its coronary laser atherectomy products comprise disposable catheters consisting of Rapid Exchange Catheter, Over-The-Wire Catheter, POINT 9 Catheter, and Quick-Cross Support Catheter. Spectranetics also offers devices for the removal of infected, defective, or abandoned pacemaker and implantable cardiac defibrillators leads.   The Company's CVX-300 Excimer laser unit includes Spectranetics Laser Sheath, a laser-assisted lead removal device; and Lead Locking Device, a mechanical device that assists in the removal of faulty leads by providing traction on the inner aspect of the leads, which are constructed of wire coils covered by insulating material. It operates in the United States, Canada, Mexico, South America, the Pacific Rim, and Australia. Spectranetics is incorporated in the State of Delaware and its principal executive offices are located at 96 Talamine Court, Colorado Springs, CO 80907.

13.     Defendant Emile J. Geisenheimer ("Geisenheimer") upon information and belief is a citizen of the State of New York.  Geisenheimer, at all relevant times, served as the Chairman of the Board of Directors and as a member of the Audit and Compensation Committees.

14.     Defendant David G. Blackburn ("Blackburn") upon information and belief is a citizen of the State of Colorado.  Blackburn, at all relevant times, served as a member of the Audit, Compensation and Nominating and Corporate Governance Committees and as a member of the Board of Directors.

15.     Defendant R. John Fletcher ("Fletcher") upon information and belief is a citizen of the State of Massachusetts.  Fletcher, at all relevant times, served as Chairman of the Compensation and Nominating and Corporate Governance Committees and as a member of the Board of Directors.

16.     Defendant Martin T. Hart ("Hart") upon and information and belief is a citizen of the State of Colorado.  Hart, at all relevant times, served as the Chairman of the Audit Committee, member of the Nominating and Corporate Governance Committee and as a member of the Board of Directors.  The Board of Directors has also determined that Defendant Hart is an audit committee financial expert, as defined by Item 407 of Regulation S-K and as required by Nasdaq 4350(d).

17.     Defendant Joseph M. Ruggio, M.D. ("Ruggio") upon information and belief is a citizen of the State of California.  Ruggio, at relevant times, served as a member of the Board of Directors.

18.     Defendant John G. Schulte ("Schulte") upon information and belief is a citizen of the State of Colorado.  Schulte, at all relevant times, served as President, Chief Executive Officer and as a member of the Board of Directors.  Schulte is considered to be an employee of Spectranetics.

19.     Defendant Craig M. Walker, M.D. ("Walker") upon information and belief is a citizen of the State of Louisiana.  Walker, at relevant times, served as a member of the Board of Directors.

20.     Defendants Geisenheimer, Blackburn, Fletcher, Hart, Ruggio, Schulte and Walker collectively are referred to hereinafter as the "Individual Defendants."   The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Spectranetics' quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market, and were responsible for oversight of the Company's business affairs.  Each Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them but not to the public, each of these Defendants knew or should have known of the harm being inflicted on the Company and knew or should have known that the adverse facts specified herein had not been disclosed and were being concealed from the public and that the positive representations which were being made were then materially false and misleading.

## <u>DUTIES OF THE INDIVIDUAL DEFENDANTS</u>

21.     By reason of their positions as officers and/or directors of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of good faith, trust, loyalty, and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner.  The Individual Defendants

were and are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligation of fair dealing.

22.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control and oversight over the Company's management and the wrongful acts complained of herein.

23.     To discharge their duties, the Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies and practices and controls of the Company.  By virtue of such duties the Individual Defendants were required to, *inter alia*:

   a.     exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

   b.     exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of  its legal authority;

   c.     exercise good faith in taking action to correct any misconduct and prevent its recurrence when placed on notice of improper or imprudent conduct by the Company and/or its employees.

24.     The Individual Defendants, particularly the members of the Audit Committee, were responsible for maintaining and establishing adequate internal accounting controls for the

Company and to ensure that the Company's financial statements were based on accurate financial information and that management was not undertaking any illegal activities.

## SUBSTANTIVE ALLEGATIONS

### Materially False and Misleading Statements Issued During the Relevant Period

25.     During the Relevant Time Period, Individual Defendants publicly issued or allowed there to be issued false and misleading statements and failed to disclose material facts necessary to make statements made by management not false and misleading.

26.     The Relevant Period begins on at least April 19, 2007.[2]   On this day, the Company issued a press release entitled, "Spectranetics Reports First Quarter Revenue of $17.4 Million as Atherectomy Product Sales Increase 52%; Company Affirms Previous 2007 Financial Guidance."  Therein, the Company, in relevant part, stated:

> Spectranetics Corporation today reported financial results for the three months ended March 31, 2007.  Revenue for the first quarter of 2007 reached $17.4 million, up 28% compared with revenue of $13.6 million for the first quarter of 2006. For the quarter, disposable product revenue rose 35% to $14.4 million, laser revenue declined 23% to $1.1 million, and service and other revenue increased 20% to $1.9 million, all compared with the first quarter of 2006. The increase in disposable product revenue for the quarter was driven primarily by a 52% increase in atherectomy product sales as compared with last year, and also included a 7% increase in lead removal revenue.
>
> The worldwide installed base of lasers increased to 657 laser systems as of March 31, 2007 (515 in the United States), which includes net laser placements of 34 units in the first quarter of 2007, compared with 29 net placements in the comparable quarter last year.
>
> Gross margin for the quarter was 73% of revenue, compared with 73% in the first quarter a year ago.  Operating expenses in the quarter were $13.2 million, up 24% from the prior-year first quarter.  The increase is primarily related to ongoing investment in an expanded field sales organization, physician training, product

---

[2] The Relevant Period may begin on an earlier date.  Documents and information concerning Defendants' breaches of duties owed to the Company are nearly all within Defendants' possession or control and will be the subject of discovery in this action.

development and clinical research initiatives to further penetrate the large and growing market for treating peripheral arterial disease (PAD).

Pre-tax income in the first quarter of 2007 was $165,000, compared with a pre-tax loss of $619,000 in the first quarter of 2006. Pre-tax income includes stock-based compensation of $669,000 for the quarter ended March 31, 2007, as compared with $620,000 during the first quarter last year. Given the Company's significant historical net operating losses which are available to offset future taxable income, any income tax expense or benefit is a non-cash item. As a result, management believes that pre-tax income or loss is the most appropriate measure of its operating performance.

For the first quarter of 2007, Spectranetics reported a net loss of $65,000, or $0.00 per share, compared with a net loss of $638,000, or $0.02 per share, in the first quarter of 2006.

Cash, cash equivalents and current and non-current investment securities totaled $52.8 million as of March 31, 2007, compared with $56.5 million as of December 31, 2006.

**"Spectranetics further expanded its role in treating PAD, as our atherectomy revenue again exceeded the overall growth in that market by a significant margin," said John G. Schulte, President and Chief Executive Officer.** *"Most importantly, we accelerated the progress of the TURBO Booster catheter when the FDA allowed us to end the CELLO trial early based on the strength of data on 61 patients, instead of continuing with the planned 85 patients. We have completed the patient follow-up study, and expect to file the 510(k) application within the next 30 days. The TURBO Booster will greatly increase our market opportunity, as approximately two-thirds of the endovascular procedures performed in the United States are for above-the-knee blockages."*

2007 Financial Guidance

Spectranetics today affirmed its previous 2007 financial guidance as follows:

Revenue for 2007 is estimated to be within the range of $79 million to $83 million, representing 24% to 31% growth compared with 2006. Revenue guidance does not include any potential contribution from the TURBO Booster product, which is the subject of the CELLO clinical trial and is targeted at treatment of above-the-knee leg blockages.

The Company expects pre-tax income, including stock-based compensation expense, to be within the range of a $600,000 pre-tax loss to pre-tax income of $1.0 million. The Company believes that pre-tax income or loss is the most relevant measure of its operating performance given that income taxes are a non-cash expense due to historical net operating losses available to offset future taxable income. For that reason and the fact that significant fluctuations in the effective

10

income tax rate are expected from quarter to quarter, the Company is not providing guidance on an effective income tax rate.  The guidance assumes gross margin for the year in the low seventies. Stock-based compensation expense is estimated to be within the range of $3.5 million to $4.5 million during 2007.

This guidance takes into consideration the following key factors:

Laser placements are expected to be within the range of 100 to 120 net new laser placements in 2007.

Incremental costs of approximately $1.1 million related to the formation and development of a six-person dedicated sales force for lead-removal products.

Incremental increases in research, development and other technology costs of approximately $2.1 million, including development work for enhancements to the excimer laser system, and clinical trials focused on below-the-knee applications and in-stent restenosis.

The costs for relocation and consolidation of the Company's headquarters and manufacturing operations to an expanded facility in Colorado Springs, which are estimated to be in the range of $900,000 to $1.2 million in 2007, a portion of which relates to maintaining dual facilities during the twelve to fifteen month transition period.

(Emphasis added.)

27.     On May 10, 2007, Spectranetics filed its Quarterly Report with the SEC on Form 10-Q. The Company's 10-Q was signed by Individual Defendant Schulte, and reaffirmed the Company's financial results previously announced on April 19, 2007.

28.     The Company's 10-Q filed on May 10, 2007 also contained Sarbanes-Oxley required certification, signed by Individual Defendant Schulte, who certified:

1.  I have reviewed this annual report on Form 10-Q of The Spectranetics Corporation;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

11

3.   Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.   The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a)   designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)   designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)   evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)   disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.   The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a)   all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

12

(b)   any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

29.      On May 2, 2007, Spectranetics issued a press release entitled, "Spectranetics Files

5 10(k) for TURBO-Booster."  Therein, the Company, in relevant part, stated:

**Spectranetics Corporation today announced it has filed a 510(k) application with the Food and Drug Administration (FDA) for the approval of its TURBO-Booster(R) product.**

The TURBO-Booster is a deflecting sheath that facilitates treatment of blockages in the popliteal artery and superficial femoral artery (SFA), which are the main arteries at or above the knee, and is used with Spectranetics' existing peripheral atherectomy laser catheters.

The application includes a full review of data and findings from Spectranetics' recently completed CELLO trial.  On March 14, 2007, the Company announced that it had stopped enrolling patients in the CELLO study after enrolling 61 of the planned 85 patients.  Based on a review of the preliminary data, Spectranetics and representatives of the FDA agreed that the clinical data from these 61 patients treated with the TURBO-Booster product was sufficient for submission to the FDA for review.  The FDA typically responds to 510(k) submissions within 90 days, although a final decision may take longer.

**"The TURBO-Booster enables true directional atherectomy with our existing peripheral atherectomy catheters, allowing creation of large lumens.  We believe approximately two-thirds of all endovascular procedures in the legs are in the larger diameter arteries above the knee, so this represents a significant market expansion opportunity for Spectranetics," said John G. Schulte, Spectranetics' president and chief executive officer.  "We are also excited by the potential for the TURBO-Booster to treat in-stent restenosis (ISR), and we plan to initiate clinical research in 2007 to assess the effectiveness of the TURBO-Booster and existing peripheral atherectomy products for the treatment of ISR."**

(Emphasis added).

30.      On July 2, 2007, Spectranetics issued a press release entitled, "Spectranetics

Receives FDA Clearance to Market TURBO-Booster."  Therein, the Company, in relevant part,

stated:

13

**Spectranetics Corporation today announced it has received clearance from the Food and Drug Administration (FDA) to market its TURBO-Booster(TM) product for the treatment of arterial stenoses and occlusions in the leg, which represents a broader indication for use as compared to current labeling of the existing peripheral laser catheters.** The TURBO-Booster functions as a guiding catheter facilitating directed ablation of blockages in the main arteries at or above the knee. The TURBO-Booster combined with Turbo elite(TM) laser catheters allows for removal of large amounts of plaque material within the SFA and popliteal arteries.

The CELLO trial, the study conducted to provide data to FDA in support of the 510(k) pre-market notifications for the TURBO-Booster clearance, is a prospective registry that enrolled 61 patients at 16 centers in the United States. The trial included patients with stenoses and occlusions that were greater than or equal to 70% and less than or equal to 100% of the vessel lumen within arteries four to seven millimeters in diameter. Three independent core labs analyzed the angiographic, intravascular ultrasound, and duplex ultrasound data from the trial. The primary endpoints of the trial were the achievement of a minimum 20% reduction in the percent diameter stenosis post-laser compared to pre-intervention and major adverse events. The reduction in percent diameter stenosis following the use of the TURBO-Booster was 35% and there were no major adverse events reported through 30 days following the procedure. As a result, the primary endpoints were met. Further data included in the FDA submission showed a significant improvement in Rutherford scores and health assessment questionnaires at 30-days compared to pre-procedure.

**"We are very pleased with the clinical data from the CELLO trial, and the subsequent positive response from the FDA, which places our TURBO-Booster program well ahead of the original timeline. TURBO-Booster significantly expands our addressable market, as we believe approximately two-thirds of all endovascular procedures in the legs are in the larger diameter arteries above the knee," said John G. Schulte, Spectranetics' President and Chief Executive Officer. _"Our current plan is to immediately begin a controlled release of the product to specified accounts over the next 30 days, which will allow for collection of valuable feedback to help guide our training and marketing programs. We expect to complete the initial launch to our atherectomy account base of approximately 350 accounts within a period of four to five months. After completion of the initial phase of the launch and receiving clinical and marketing feedback regarding the performance of the TURBO-Booster, we will update our annual financial guidance, which we expect to occur during our investor conference call discussing third quarter financial results in late October."_**

(Emphasis added.)

31.     On July 12, 2007, Spectranetics issued a press release entitled, "Spectranetics Receives FDA Clearance for Expanded Labeling for TURBO Elite; Entire Catheter Line Now Cleared for Treatment of All Blockages in Leg Arteries."  Therein, the Company, in relevant part, stated:

> **Spectranetics Corporation (Nasdaq: SPNC) today announced it has received clearance from the Food and Drug Administration (FDA) to market its TURBO elite(TM) line of laser catheters for the treatment of all stenoses and occlusions within arteries of the leg.**  The clearance applies to catheters ranging in size from .9 millimeters to 2.5 millimeters.  This represents a broader indication for use as compared to previous labeling of the TURBO elite catheters for the treatment of total occlusions that cannot be crossed with a guidewire. The expanded labeling is resulting from the clinical data in the CELLO study.
>
> *"This authorization creates significant new opportunities for the standalone TURBO elite in addition to that product's unique capability to treat occlusions not crossable with a guidewire," said John G. Schulte, Spectranetics' President and Chief Executive Officer.  "Combined with the recent similar approval for our TURBO-Booster(TM) product, Spectranetics now provides one of the industry's broadest lines of atherectomy products to treat peripheral artery disease."*
>
> On July 2, 2007, the Company announced it had received clearance from the FDA to market TURBO-Booster for the treatment of arterial stenoses and occlusions in the leg.  TURBO-Booster functions as a guiding catheter facilitating directed ablation of blockages in the main arteries at or above the knee.  The TURBO-Booster combined with Turbo elite laser catheters allows for removal of large amounts of plaque material within the SFA and popliteal arteries.

(Emphasis added.)

32.     On July 25, 2007, Spectranetics issued a press release entitled, "Spectranetics Reports Second Quarter Revenue of $20.4 Million as Atherectomy Product Sales Increase 43% Pre-Tax Income Up 97%; Installed Laser Base Nears 700 Pre-Tax Income Guidance Raised." Therein, the Company, in relevant part, stated:

> Spectranetics Corporation (Nasdaq: SPNC) today reported financial results for the three and six months ended June 30, 2007.

Revenue for the second quarter of 2007 reached $20.4 million, up 27% compared with revenue of $16.0 million for the second quarter of 2006. For the quarter, disposable product revenue rose 35% to $17.4 million, laser revenue declined 23% to $1.1 million, and service and other revenue increased 11% to $1.9 million, all compared with the second quarter of 2006. The increase in disposable product revenue for the quarter was driven primarily by a 43% increase in atherectomy product sales as compared with last year, and also included an 18% increase in lead removal revenue.

The worldwide installed base of lasers increased to 693 laser systems as of June 30, 2007 (547 in the United States), which includes net laser placements of 36 units in the second quarter of 2007, compared with 25 net placements in the comparable quarter last year.

Gross margin for the quarter was 75% of revenue, compared with 74% in the second quarter a year ago. Operating expenses in the quarter were $14.9 million, up 27% from the prior-year second quarter. The increase is primarily related to ongoing investment in an expanded field sales organization, physician training, product development and clinical research initiatives to further penetrate the large and growing market for treating peripheral arterial disease (PAD).

Pre-tax income in the second quarter of 2007 was $1,017,000, compared with pre-tax income of $516,000 in the second quarter of 2006. Pre-tax income includes stock-based compensation of $714,000 for the quarter ended June 30, 2007 as compared with $607,000 during the second quarter last year. Given the Company's significant historical net operating losses which are available to offset future taxable income, any income tax expense or benefit is a non-cash item. As a result, management believes that pre-tax income or loss is the most appropriate measure of its operating performance.

For the second quarter of 2007, Spectranetics reported net income of $7.2 million, or $0.21 per diluted share, compared with net income of $308,000, or $0.01 per diluted share, in the second quarter of 2006. Net income for the second quarter of 2007 includes a $6.6 million non-cash income tax benefit, which establishes a deferred tax asset representing the estimated amount of net operating losses the Company currently expects to offset with future taxable income. This income tax benefit is offset by a provision for income taxes of $465,000, leaving a net income tax benefit of $6.1 million for the quarter ended June 30, 2007.

Cash, cash equivalents and current and non-current investment securities totaled $53.5 million at June 30, 2007, compared with $56.5 million at December 31, 2006 and $52.8 million at March 31, 2007.

**"I'm proud of this quarter's financial performance, which was driven by atherectomy product sales and supported by gains in our lead removal business.** *The growth in revenue by $3 million as compared with the first quarter of 2007*

16

*represents the largest sequential revenue increase we have ever achieved.* **Our continued strong performance and expanding market share reflect both the advantages of our laser technology in treating PAD and the solid execution of our growth strategy," said John G. Schulte, President and Chief Executive Officer. "Over the last several quarters we have introduced improvements to our catheter line, upgraded and expanded our sales force, and conducted an industry-leading physician training and education program. This has resulted in an expanded user base and greater utilization of our technology. We now have in place a broad foundation of leading physicians from which to leverage the introduction of the TURBO-Booster(TM), which received FDA clearance at the end of June. We have initiated a controlled release of TURBO-Booster to specified accounts, which will allow for collection of valuable feedback to help guide our training and marketing programs. Over the next four to five months, we expect to complete the TURBO-Booster launch to our existing 350 atherectomy accounts."**

Year-to-Date Financial Results Revenue for the first half of 2007 rose 27% to $37.7 million, from $29.6 million for the first half of 2006. Year-to-date 2007 disposable product revenue was $31.8 million, up 35% compared with disposable product revenue of $23.5 million in the first half of 2006, and equipment revenue was down 23% to $2.2 million from $2.8 million in the first half of 2006. Service and other revenue for the first six months of 2007 was $3.8 million, up 15% compared with service and other revenue of $3.3 million for the comparable period in 2006.

Gross margin for the first half of 2007 was 74%, compared with 73% in the first half of 2006. Operating expenses were $28.2 million, up 26% from $22.4 million for the first half of the prior-year.

Pre-tax income for the first half of 2007 was $1,182,000 compared with a pre-tax loss of ($103,000) in the first half of 2006. Net income for the first half of 2007 was $7.1 million, or $0.21 per diluted share, compared with a net loss of ($330,000), or ($0.01) per diluted share, in the first half of 2006. Net income for the first half 2007 includes a $6.6 million non-cash income tax benefit, which establishes a deferred tax asset representing the amount of net operating losses the Company currently expects to offset with future taxable income. This income tax benefit is offset by a provision for income taxes of $695,000, leaving a net income tax benefit of $5.9 million for the six months ended June 30, 2007.

2007 Financial Guidance

Spectranetics today raised its 2007 pre-tax income guidance and affirmed its previous 2007 revenue guidance as follows:

The Company expects pre-tax income, including stock-based compensation expense, to be within the range of $1.5 to $3.0 million. This compares with previous guidance within the range of a $600,000 pre-tax loss to pre-tax income of $1.0 million. The

Company believes that pre-tax income is the most relevant measure of its operating performance given that income taxes are a non-cash expense due to historical net operating losses available to offset future taxable income.  For that reason and the fact that significant fluctuations in the effective income tax rate are expected from quarter to quarter, the Company is not providing guidance on an effective income tax rate.   The guidance assumes gross margin for the year in the low to mid-seventies.  Stock-based compensation expense is estimated to be within the range of $3.0 million to $4.0 million during 2007, as compared with $3.5 million to $4.5 million in previous guidance.

Revenue for 2007 is estimated to be within the range of $79 million to $83 million, representing 24% to 31% growth compared with 2006.  While revenue guidance does not include any potential contribution from the TURBO Booster product, we do expect incremental sales from this product in 2007 and will update 2007 revenue guidance when we have sufficient information to make a reasonable estimate.

This guidance takes into consideration the following key factors:

Laser placements are expected to be within the range of 120 to 140 net new laser placements in 2007, up from previous guidance of 110 to 120 new laser placements.

The size of the field sales organization will be in the range of 95 to 105 employees, which includes dedicated lead removal sales representatives. This compares to 78 employees in the field sales organization at December 31, 2006.

The costs for relocation and consolidation of the Company's headquarters and manufacturing operations to an expanded facility in Colorado Springs, which are estimated to be in the range of $900,000 to $1.2 million in 2007, a portion of which relates to maintaining dual facilities during the twelve to fifteen month transition period.

(Emphasis added).

33.     On August 9, 2007, Spectranetics filed its Quarterly Report with the SEC on Form 10-Q.  The Company's 10-Q was signed by Individual Defendant Schulte, and reaffirmed the Company's financial results previously announced on July 25, 2007.  The Company's 10-Q also contained Sarbanes-Oxley required certification signed by Individual Defendants Schulte, substantially similar to the certification contained in ¶28, *supra*.

34.     On September 26, 2007, Spectranetics issued a press release entitled, "Spectranetics Enrolls First Patient in PATENT Trial for the Treatment of In-stent Restenosis."  Therein, the Company, in relevant part, stated:

> Spectranetics Corporation today announced it has enrolled the first patient in the PATENT trial utilizing the Company's TURBO elite(TM) laser catheters in combination with the recently FDA cleared TURBO-Booster(TM).
>
> The PATENT trial is a prospective registry of 100 patients at up to 10 sites in Germany.  The trial will assess patency as measured by duplex ultrasound at various intervals up to 12 months following the procedure.  It will also assess safety as measured by adverse events up to 12 months following the procedure.  In the initial procedure performed at the Leipzig Heart Center, four focal lesions were treated successfully with the TURBO-Booster and TURBO elite 2.0mm catheter in a 20cm long stented superficial femoral artery.
>
> *"The initial result from this Spectranetics device looks very promising, as the new features allow for ablation of more tissue in larger vessels,"* said Andrej Schmidt, M.D., of the University of Leipzig-Heart Center.  "In-stent restenosis in a superficial femoral artery represents one of the most challenging procedures in our practice.  The current standard of care, such as repeat balloon angioplasty, does not have good results as these lesions tend to reoccur.  *We are very excited with the start of this study in Germany, and we look forward to examining the mid- and long-term results of this new therapy."*
>
> *John G. Schulte, Spectranetics' President and Chief Executive Officer, commented, "We are very pleased to have begun this trial at one of Europe's most prestigious medical centers.  We believe that in-stent restenosis in the superficial femoral artery may represent 25% to 35% of all above-the-knee procedures, and there is currently not a good solution for this challenging lesion subset."*

(Emphasis added.)

35.     On October 24, 2007, Spectranetics issued a press release entitled, "Spectranetics Announces Clinical Data From Cello Trial; Six Month Data Demonstrates Durability of Procedure and Improved Clinical Outcomes."  Therein, the Company, in relevant part, stated:

> Spectranetics Corporation today announced the presentation of results from its CELLO (CLiRpath Excimer Laser System to Enlarge Lumen Openings) clinical trial, at the nineteenth annual Transcatheter Cardiovascular Therapeutics (TCT) scientific symposium in Washington, D.C.  The study was a prospective, non-randomized trial

designed to provide clinical data on the reduction of arterial blockage in above-the-knee arteries following use of the Spectranetics TURBO-Booster(TM) product for the treatment of peripheral artery disease (PAD). TURBO-Booster received clearance from the Food and Drug Administration (FDA) in July 2007 following the conclusion of the trial, which enrolled 65 patients at 17 hospitals in the United States.

Highlights of the data presented include:

Achievement of significant tissue removal, which exceeded the targeted primary endpoint, measured by angiographic and IVUS core labs;

Demonstrated durability of procedure through freedom from target lesion revascularization in 86% of the patients through six months following the initial procedure;

No major adverse cardiac events reported through six months following the procedure, which adds to the existing body of clinical evidence supporting the safety of laser ablation; and

Significant improvement in all clinical outcomes measured six months following the procedure, including Rutherford category, ankle-brachial Index, and walking impairment.

*"The six-month data from the CELLO trial demonstrates the ability of laser ablation facilitated by the TURBO-Booster to safely restore blood flow in the superficial femoral artery and significantly improve clinical outcomes in patients with peripheral arterial disease up to six months following the procedure," said Dr. Rajesh Dave, national principal investigator of the CELLO trial and chairman, Endovascular Medicine, Pinnacle Health Heart and Vascular Institute at Harrisburg Hospital. "Many patients suffer unnecessarily from pain in the legs and feet that can drastically impact active lifestyles. The TURBO-Booster represents a viable treatment option for those patients with peripheral arterial disease."*

Spectranetics' TURBO-Booster functions as a guiding catheter facilitating directed ablation of blockages in the main arteries at or above the knee. The TURBO-Booster combined with Spectranetics' Turbo elite(TM) laser catheters allows for removal of large amounts of plaque material within the superficial femoral artery (SFA) and popliteal arteries.

*"With conclusive data on the effectiveness of the TURBO-Booster product, Spectranetics is working with physicians to improve the lives of the millions suffering from blocked arteries above the knee. Our laser ablation system is easy to use and effective at getting patients back on their feet and engaged in active lifestyles, "said John G. Schulte, Spectranetics' president and CEO.*

20

>*"Since receiving FDA clearance in July, several hundred procedures have been performed, with more than 180 accounts placing their initial order and nearly 45 percent of those having already re-ordered.   Our limited market release of TURBO-Booster is right on schedule and we plan to complete this initial phase of our market launch in the current quarter."*

(Emphasis added.)

36.     On October 31, 2007, Spectranetics issued a press release entitled, "Spectranetics Reports Third Quarter Revenue of $21.2 Million as Atherectomy Product Sales Increase 42%; Raises 2007 Financial Guidance."  Therein, the Company, in relevant part, stated:

> Spectranetics Corporation today reported financial results for the three and nine months ended September 30, 2007.
>
> Revenue for the third quarter of 2007 reached $21.2 million, up 31% compared with revenue of $16.2 million for the third quarter of 2006.  For the quarter, disposable product revenue rose 36% to $17.3 million, laser revenue increased 17% to $2.0 million, and service and other revenue increased 12% to $2.0 million, all compared with the third quarter of 2006.  The increase in disposable product revenue for the quarter was driven primarily by a 42% increase in atherectomy product sales as compared with last year, and also included an 18% increase in lead removal revenue.
> The worldwide installed base of lasers increased to 713 laser systems as of September 30, 2007 (563 in the United States), which includes net laser placements of 20 units in the third quarter of 2007, compared with 37 net placements in the comparable quarter last year.
>
> Gross margin for the quarter was 74% of revenue, compared with 74% in the third quarter a year ago.  Operating expenses in the quarter were $15.6 million, up 24% from the prior-year third quarter.  The increase is due primarily to an expanded field sales organization, which totals 100 employees as of September 30, 2007.
>
> Pre-tax income for the third quarter of 2007 was $844,000, compared with pre-tax income of $32,000 for the third quarter of 2006.  Pre-tax income includes stock-based compensation expense of $859,000 for the quarter ended September 30, 2007 as compared with $748,000 for the third quarter last year.  Given the Company's significant historical net operating losses which are available to offset future taxable income, any income tax expense or benefit is a non-cash item.  As a result, management believes that pre-tax income or loss is the most appropriate measure of its operating performance.

For the third quarter of 2007, Spectranetics reported net income of $231,000, or $0.01 per diluted share, compared with a net loss of $165,000, or $0.01 per diluted share, in the third quarter of 2006.

Cash, cash equivalents and current and non-current investment securities totaled $53.8 million as of September 30, 2007, compared with $56.5 million as of December 31, 2006 and $53.5 million as of June 30, 2007.

***"Our performance in the third quarter reflects our very strong competitive position in the PAD market,"* said John G. Schulte, President and Chief Executive Officer.** "We now offer solutions to treat the entire leg, and our laser is the only system that can address all three major lesion types - calcium, plaque and thrombus, and treat blocked arteries throughout the leg which range in diameter from 7 millimeters down to 1.5 millimeters. The limited release of the TURBO-Booster(TM) is right on track with our objectives. We have penetrated approximately half of our 350 atherectomy accounts, and we have received very positive feedback from physicians regarding performance. ***With this initial success, we have narrowed our revenue guidance to the top end of the previous range. We are also pleased with the progress in our clinical trials for treating in-stent restenosis.*** We enrolled the first patient in the PATENT trial in Germany in late September, and expect the SALVAGE trial to begin later this quarter. We believe in-stent restenosis represents a major unmet medical need, affecting 25% to 35% of all above-the-knee procedures."

Year-to-Date Financial Results Revenue for the first nine months of 2007 rose 29% to $59.0 million, from $45.8 million for the first nine months of 2006. Year-to-date 2007 disposable product revenue was $49.0 million, up 35% compared with disposable product revenue of $36.2 million in the first nine months of 2006, and equipment revenue was down 8% to $4.2 million from $4.5 million for the first nine months of 2006. Service and other revenue for the first nine months of 2007 was $5.8 million, up 14% compared with service and other revenue of $5.1 million for the comparable period in 2006.

Gross margin for the first nine months of 2007 was 74%, compared with 74% in the comparable period of 2006. Operating expenses were $43.7 million, up 25% from $35.0 million for the first nine months of the prior-year.

Pre-tax income for the first nine months of 2007 was $2.0 million compared with a pre-tax loss of $71,000 in the first nine months of 2006. Net income for the first nine months of 2007 was $7.3 million, or $0.22 per diluted share, compared with a net loss of $495,000, or $0.02 per diluted share, in the comparable period of 2006. Net income for the 2007 year-to-date period includes a $6.6 million non-cash income tax benefit, recorded in the second quarter of 2007, which establishes a deferred tax asset representing the amount of net operating losses the Company currently expects to offset with future taxable income. This income tax benefit is offset by a year-to-date

provision for income taxes of $1.3 million, leaving a net income tax benefit of $5.3 million for the nine months ended September 30, 2007.

2007 Financial Guidance

Spectranetics today raised 2007 revenue and pre-tax income guidance as follows:

The Company expects revenue for 2007 to be within the range of $81 million to $83 million, representing 28% to 31% growth compared with 2006. This guidance is towards the high end of the previous range of $79 to $83 million and reflects a modest contribution from the initial phase of our TURBO-Booster product launch.

The Company expects pre-tax income for 2007 to be within the range of $2.5 to $4.0 million. This compares with previous guidance for pre-tax income to be in the range of $1.5 to $3.0 million, which was updated in the second quarter from our original guidance of a $600,000 pre-tax loss to pre-tax income of $1.0 million. The Company believes that pre-tax income is the most relevant measure of its operating performance given that income taxes are a non-cash expense due to historical net operating losses available to offset future taxable income. For that reason and the fact that significant fluctuations in the effective income tax rate are expected from quarter to quarter, the Company is not providing guidance on net income.

This guidance takes into consideration that net new laser placements for 2007 will fall within the previously communicated range of 120 to 140 laser systems.

(Emphasis added.)

37.     On November 9, 2007, Spectranetics filed its Quarterly Report with the SEC on Form 10-Q. The Company's 10-Q was signed by Defendant Schulte, and reaffirmed the Company's financial results previously announced on October 31, 2007. The Company's 10-Q also contained Sarbanes-Oxley required certification signed by Individual Defendant Schulte, substantially similar to the certification contained in ¶28, *supra*.

38.     On February 20, 2008, Spectranetics issued a press release entitled, "Spectranetics Fourth Quarter Revenue up 35% to $23.9 Million, Features Strong Lead Management and Atherectomy Product Sales; Introduces 2008 Financial Guidance." Therein, the Company, in relevant part, stated:

23

Spectranetics Corporation today reported financial results for the quarter and year ended December 31, 2007.

Revenue for the fourth quarter of 2007 was $23.9 million, up 35% compared with revenue of $17.7 million for the fourth quarter of 2006.  Disposable product revenue rose 36% to $19.6 million, laser revenue increased 55% to $2.1 million, and service and other revenue increased 14% to $2.2 million, all compared with the fourth quarter of 2006.  The increase in disposable product revenue was comprised of a 32% increase in vascular intervention product sales (including atherectomy products and support catheters) and a 45% increase in lead management revenue, compared with the prior-year fourth quarter.

The worldwide installed base of lasers increased to 743 as of December 31, 2007 (587 in the United States), which included net laser placements of 30 units in the fourth quarter of 2007, compared with 38 net placements in the fourth quarter of 2006.

Gross margin for the quarter was 72% of revenue, compared with 73% in the fourth quarter of the prior year.  Operating expenses in the quarter were $17.1 million, up 16% from the prior-year fourth quarter due primarily to an expanded field sales organization, which totaled 104 employees as of December 31, 2007.

Pre-tax income for the fourth quarter of 2007 was $628,000, compared with a pre-tax loss of $1.2 million for the fourth quarter of 2006.  Results in the fourth quarter of 2006 included $690,000 for an unfavorable verdict in an intellectual property dispute, and legal fees of approximately $500,000 for litigation related to the dispute.  Given the Company's significant historical net operating losses that are available to offset future taxable income, any income tax expense or benefit is a non-cash item. As a result management believes that pre-tax income or loss is the most appropriate measure of its operating performance.

For the fourth quarter of 2007 Spectranetics reported a net loss of $89,000, or $0.00 per share, compared with a net loss of $952,000, or $0.03 per share, in the fourth quarter of 2006.

Cash, cash equivalents and current and non-current investment securities totaled $54.4 million as of December 31, 2007, compared with $56.5 million as of December 31, 2006 and $53.8 million as of September 30, 2007.

*"I am proud to report that during 2007 Spectranetics strengthened its competitive position and achieved our financial objectives, including record revenue and pre-tax income," said John G. Schulte, President and Chief Executive Officer.  "With the successful introduction of the TURBO-Booster(R) into nearly 300 accounts, we believe we can treat the broadest range of lesions throughout the entire leg. In addition, sales of our lead management products were above our expectations in the quarter, and we believe that business has reached an inflection point.  In light*

24

*of opportunity in this area, we are expanding the sales force dedicated to lead management while simultaneously refocusing the larger portion of our sales group solely on vascular intervention products. This split of the sales team, which we initiated in January, allows our sales representatives to more effectively build their business by concentrating on one set of products and call points.*

"We will continue to make strategic investments in clinical trial programs such as the PATENT and SALVAGE trials for in-stent restenosis, in addition to product development programs related to our laser system and disposable products. These investments provide us with an opportunity to further penetrate existing markets and to potentially expand the applications and indications for use of our technology. Our outlook for 2008 reflects confidence in our technology and products, our markets and our employees."

Full Year 2007 Financial Results

Revenue for 2007 rose 31% to $82.9 million, from $63.5 million for 2006. Disposable product revenue was $68.6 million, up 36% compared with $50.6 million in 2006, and equipment revenue was $6.3 million, up 7% from $5.9 million in 2006. Service and other revenue in 2007 was $7.9 million, up 13% compared with $7.0 million in 2006.

Gross margin for 2007 was 74%, compared with 73% in 2006. Operating expenses in 2007 were $60.9 million, up 22% from $49.7 million in 2006, primarily related to the expansion of our field sales organization, which increased from 77 employees to 104 employees during the year ended December 31, 2007.

Pre-tax income for 2007 was $2.7 million as compared with a pre-tax loss of $1.3 million in 2006. Pre-tax loss for 2006 included $690,000 for an unfavorable verdict in an intellectual property dispute, and legal fees of approximately $500,000 for litigation related to the dispute.

Net income for 2007 was $7.2 million, or $0.21 per diluted share, compared with a net loss of $1.4 million, or $0.05 per share, in 2006. Net income for 2007 included a $6.6 million non-cash income tax benefit, recorded in the second quarter of 2007, which established a deferred tax asset representing the amount of net operating losses the Company currently expects to offset with future taxable income. This income tax benefit was offset by a provision for income taxes of $2.0 million, leaving a net income tax benefit of $4.6 million for 2007. Given the Company's significant historical net operating losses, any income tax expense or benefit is a non-cash item; therefore, management believes that pre-tax income or loss is the most appropriate measure of its operating performance.

2008 Financial Guidance

The Company expects revenue for 2008 to be within the range of $104 million to $110 million, representing 25% to 33% growth compared with 2007.

Gross margin for 2008 is expected to be within the range of 72% - 74%. Research, development and other technology costs are expected to be approximately 14% to 15% of revenue and selling, general and administrative costs are expected to be within the range of 55% - 58% of revenue.  Gross margin and operating expense costs may fall outside of the ranges provided above in any given quarter due to factors that include, but are not limited to, timing of move-related costs associated with the move of our manufacturing operations to an expanded facility, product development costs, clinical trial enrollment rates and expansion of the field sales organization.

Pre-tax income for 2008 is expected to be within the range of $1.0 million to $5.0 million.  The Company believes that pre-tax income is the most relevant measure of its operating performance given that income taxes are a non-cash expense due to historical net operating losses available to offset future taxable income.  For that reason and the fact that significant fluctuations in the effective income tax rate are expected from quarter to quarter, the Company is not providing guidance on net income.

This guidance takes into consideration the following key factors related to gross margin and operating expenses:

Costs associated with relocation and consolidation of the Company's headquarters and manufacturing operations to an expanded facility in Colorado Springs. The move of manufacturing operations is expected to commence in the first quarter and be substantially complete by the end of 2008.

Costs associated with the addition of manufacturing engineering and quality assurance personnel to support our continuing and anticipated growth in our manufacturing operations.

Research, development and other technology costs include increased design and development costs for enhancements to the excimer laser system and increased costs associated with various clinical research, which is primarily targeted at in-stent restenosis, safety data on the removal of pacemaker and defibrillator leads and the treatment of thrombus-laden lesions.

Expansion of our sales and marketing organization by eight to ten professionals outside of the United States, primarily in Europe.

(Emphasis added.)

39.     On March 17, 2008, Spectranetics filed its Annual Report with the SEC on Form 10-K.  The Company's 10-K was signed by Individual Defendants Schulte, Geisenheimer, Blackburn, Fletcher, Hart, Ruggio and Walker, and reaffirmed the Company's financial results previously announced on February 20, 2008.

40.     The Company's 10-K filed on March 17, 2008 also contained Sarbanes-Oxley required certification, signed by Individual Defendant Schulte, who certified:

5.      I have reviewed this annual report on Form 10-K of The Spectranetics Corporation;

6.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

7.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

8.      The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(e)     designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(f)     designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(g)    evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(h)    disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(c)    all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(d)    any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

41.    On February 25, 2008, Spectranetics issued a press release entitled, "First Patient Enrolled in Study Evaluating Performance of Spectranetics Laser Ablation Followed by GORE VIABAHN(R) Endoprosthesis with Heparin Bioactive Surface; Physician-sponsored study to examine combination therapy for lower limb in-stent restenosis in patients treated for Peripheral Vascular Disease."  Therein, the Company, in relevant part, stated:

> **W. L. Gore & Associates, Inc. (Gore) and Spectranetics (NASDAQ: SPNC) today announced the enrollment of the first two patients in the VIVA II: SALVAGE Trial. The patients were treated by Dr. Eric Dippel at Midwest Cardiovascular Research in Davenport, Iowa.**  The physician-sponsored SALVAGE Trial, is designed to evaluate the safety and performance of the GORE VIABAHN(R) Endoprosthesis with Heparin Bioactive Surface and the Spectranetics TURBO-Booster(R) and TURBO elite(R) laser catheter with the CVX-300(R) Excimer Laser System for the treatment of peripheral vascular disease (PVD) in the superficial femoral artery (SFA).  Specifically, the study will evaluate the effectiveness of this combination therapy as a treatment for patients with

chronic lower-limb ischemia associated with femoro-popliteal in-stent restenosis.

Restenosis is a re-narrowing or blockage of an artery at the same site where treatment, such as a stent procedure, has already taken place. The SALVAGE Trial will evaluate patients experiencing in-stent restenosis after being treated for PVD, also called Peripheral Arterial Disease (PAD), which affects as many as 12 million Americans. The disease manifests as a buildup of plaque in the wall of an artery and results in either narrowing or blocking of the artery, limiting blood flow to the limbs.

The SALVAGE Trial (a prospective, multicenter trial to evaluate the safety and performance of Spectranetics' laser with adjunct PTA and GORE VIABAHN Endoprosthesis with Heparin Bioactive Surface for the treatment of SFA in-stent restenosis) is a physician-sponsored investigational device exemption (PS-IDE) study by the Vascular Interventional Advances (VIVA) physicians that is co-funded by Gore and Spectranetics. This prospective, multi-center trial has a primary endpoint of 12-month patency measured by ultrasound. Up to 100 patients with in-stent restenosis of the SFA will be enrolled in the SALVAGE Trial.

*"The enrollment of the first patient in the SALVAGE Trial marks the beginning of an extensive investigation. We are optimistic this study will lead to the availability of an effective, minimally-invasive treatment option for those suffering from in-stent re-stenosis," said Eric Dippel, M.D., Midwest Cardiovascular Research.*

*"The SALVAGE Trial provides a unique and rare opportunity to study two ground-breaking technologies for the treatment of a condition that affects about 20 to 30 percent of patients treated with stents for PVD in the SFA," said John Laird, M.D., University of California, Davis and Principle Investigator for the SALVAGE Trial. "We expect that this landmark study will provide the medical community with critical insight into the possibilities of combining laser atherectomy and heparin-bonded stent grafts in the treatment of in-stent restenosis."*

**The Spectranetics TURBO-Booster, cleared by the Food and Drug Administration (FDA) in 2007, functions as a guiding catheter facilitating directed ablation of blockages in the main arteries at or above the knee. The TURBO-Booster combined with Spectranetics' FDA-cleared TURBO elite laser catheters allows for removal of large amounts of plaque material above the knee within the SFA and popliteal arteries.**

The GORE VIABAHN Endoprosthesis with Heparin Bioactive Surface is the only stent graft approved for treating PVD in the SFA. The device was approved by the FDA in 2007 and combines Gore's proprietary heparin surface treatment with the GORE VIABAHN Endoprosthesis. The excellent flexibility of the GORE

> VIABAHN Endoprosthesis enables it to better traverse tortuous areas of the SFA and conform more closely to the complex anatomy of the artery.

(Emphasis added.)

42.     On April 23, 2008, Spectranetics issued a press release entitled, "Spectranetics First Quarter Revenue up 37% to $23.8 Million, Driven by Strong Vascular Intervention and Lead Management Performance; Affirms 2008 Financial Guidance."  Therein, the Company, in relevant part, stated:

> Spectranetics Corporation today reported financial results for the quarter ended March 31, 2008.
>
> Revenue for the first quarter of 2008 was $23.8 million, up 37% compared with revenue of $17.4 million for the first quarter of 2007.  Disposable product revenue rose 39% to $20.1 million, laser revenue increased 56% to $1.7 million, and service and other revenue increased 11% to $2.1 million, all compared with the first quarter of 2007.  The increase in disposable product revenue was comprised of a 36% increase in vascular intervention product sales (including atherectomy products and support catheters) and a 48% increase in lead management revenue, compared with the prior-year first quarter.
>
> The worldwide installed base of lasers increased to 767 as of March 31, 2008 (607 in the United States), which included net laser placements of 24 units in the first quarter of 2008, compared with 34 net placements in the first quarter of 2007.
>
> Gross margin for the quarter was 72% of revenue, compared with 73% in the first quarter of the prior year.  Operating expenses in the quarter were $18.5 million, up 40% from the prior-year first quarter due primarily to costs associated with the expansion of our United States field sales organization, which includes 111 employees at March 31, 2008, combined with increased product development and clinical study costs.  The pre-tax loss for the first quarter of 2008 was $685,000, compared with pre-tax income of $165,000 for the first quarter of 2007.  Given the Company's significant historical net operating losses that are available to offset future taxable income, any income tax expense or benefit is a non-cash item. As a result, management believes that pre-tax income or loss is the most appropriate measure of its operating performance.
>
> For the first quarter of 2008 Spectranetics reported a net loss of $405,000, or $0.01 per share, compared with a net loss of $65,000, or $0.00 per share, in the first quarter of 2007.

Cash, cash equivalents and current and non-current investment securities totaled $53.4 million as of March 31, 2008, compared with $54.4 million as of December 31, 2007.

*"We achieved significant sales growth both in our vascular intervention and lead management product groups, reflecting the strength of our technology and the continuing opportunities in these markets," said John G. Schulte, President and Chief Executive Officer. "This strong performance also validates our decision to separate the sales force into two groups focused on vascular intervention products and lead management products. The split of the sales team, which we initiated in January, allows our sales representatives to more effectively build their business by concentrating on one set of products and call points.*

"Our financial results to date are on track with our expectations, and we look forward to continued growth and improving profitability. As such, we are affirming the annual financial guidance we provided in February," said Schulte.

2008 Financial Guidance

Spectranetics affirms the financial guidance for 2008 provided earlier this year, which is repeated herein for reference.

The Company expects revenue for 2008 to be within the range of $104 million to $110 million, representing 25% to 33% growth compared with 2007.

Gross margin for 2008 is expected to be within the range of 72% to 74%. Research, development and other technology costs are expected to be approximately 14% to 15% of revenue and selling, general and administrative costs are expected to be within the range of 55% to 58% of revenue. Gross margin and operating expense costs may fall outside of the ranges provided above in any given quarter due to factors that include, but are not limited to, timing of move-related costs associated with the move of our manufacturing operations to an expanded facility, product development costs, clinical trial enrollment rates and expansion of the field sales organization.

Pre-tax income for 2008 is expected to be within the range of $1.0 million to $5.0 million. The Company believes that pre-tax income is the most relevant measure of its operating performance given that income taxes are a non-cash expense due to historical net operating losses available to offset future taxable income. For that reason and the fact that significant fluctuations in the effective income tax rate are expected from quarter to quarter, the Company is not providing guidance on net income.

(Emphasis added.)

43.    On May 12, 2008, Spectranetics filed its Quarterly Report with the SEC on Form 10-Q. The Company's 10-Q was signed by Individual Defendant Schulte, and reaffirmed the Company's financial results previously announced on April 23, 2008. The Company's 10-Q also contained Sarbanes-Oxley required certification signed by Individual Defendant Schulte, substantially similar to the certifications contained in ¶28, *supra.*

44.    On May 13, 2008, Spectranetics issued a press release entitled, "Spectranetics Acquires Endovascular Business of Kensey Nash." Therein, the Company, in relevant part, stated:

**Spectranetics Corporation today announced it has entered into a definitive agreement to acquire the endovascular business of Kensey Nash Corporation (Nasdaq:KNSY) for upfront consideration of $10 million with additional payments up to an aggregate of $14 million, subject to achievement of certain sales, product development and FDA approval objectives.** The transaction is subject to customary closing conditions and is expected to close by June 30, 2008.

* * * *

*John G. Schulte, Spectranetics' President and Chief Executive Officer, stated, "The acquisition of the endovascular business of Kensey Nash will both strengthen and broaden our existing presence in the treatment of thrombus and chronic total occlusions. The QuickCat aspiration catheter and the ThromCat mechanical thrombectomy catheter provide a continuum of options for treating thrombus and certainly complement laser ablation for complex disease. The SafeCross wire, which utilizes radiofrequency energy, fits nicely with our QuickCross(R) catheters for crossing total occlusions when standard guidewires fail. Adding these products to our recently specialized vascular intervention sales organization will leverage our presence with the same physician customers already served prior to this transaction. Throughout our due diligence, we were impressed with the capabilities of the existing Kensey Nash endovascular products and are truly excited about the next generation devices under development. We believe our distribution capabilities combined with the product development expertise of Kensey Nash represent a compelling opportunity to expand the use of these products."*

Joseph W. Kaufmann, President of CEO of Kensey Nash, commented, "Spectranetics is well respected as a market leader in treating arterial blockages with its unique laser atherectomy platform. The addition of our thrombectomy and CTO products to Spectranetics' business will create a market leading entity that combines Spectranetics' well-established sales and marketing organization in the thrombus

management and CTO markets with Kensey Nash's product development and manufacturing capabilities."

The Company does not expect this transaction to impact existing 2008 revenue and pre-tax income guidance, excluding any charges that may be associated with the transaction, such as in-process research and development.  As such, the Company is not updating 2008 financial guidance at this time.

(Emphasis added.)

45.    On May 15, 2008, Spectranetics issued a press release entitled, "Spectranetics Introduces New Device for Removal of Non-Functional and Infected Cardiac Leads; LLD EZ(TM) Provides Physicians with Flexibility and Control for Lead Removal." Therein, the Company, in relevant part, stated:

**Spectranetics Corporation (Nasdaq: SPNC) today announced the availability of the new LLD EZ Lead Locking Device (LLD) for the removal of non-functional or infected pacing and defibrillation leads.  The LLD EZ enables physicians to secure the entire lead creating traction to enable the removal process.**

Management of implanted leads for pacemakers and defibrillators is a growing concern among physicians and patients since an increasing number of patients receive these devices at a relatively young age. Leads, or insulated wires that connect devices to the heart, may become non-functional or infected.  When this occurs the primary treatment option is to remove the leads.  Because scar tissue can bind the leads in several places along their length, specialized tools are needed to complete the removal process.

Spectranetics' LLD EZ provides a flexible solution to address the removal of leads from scar tissue holding them in place.  LLD EZ employs a braided mesh that expands to secure leads along their hollow inner lumen permitting physicians to apply steady traction on the lead.  The locking mechanism can be reversed, or unlocked, if the physician needs to remove the device from the lead or reposition it.  The LLD EZ provides versatility to remove a wide range of pacing and defibrillation lead sizes.

*"Controlling the entire lead length throughout the removal process is important for achieving safe and complete removal.  The LLD technology gives me this control; it's a feature that other tools don't offer," said Dr. Laurence Epstein, Chief of Cardiac Arrhythmia Services, Brigham and Women's Hospital in Boston.  "The design of the LLD EZ makes it easy to incorporate this tool into my cases."*

LLD EZ also features an enhanced tip design and sleek profile to facilitate tracking and passage of the device through tight curves and beyond lumen damage. The specialized tip is radiopaque, enabling verification of tip location under fluoroscopy. Additionally, a new low-profile handle design permits easy loading of extraction sheaths. Spectranetics' Lead Locking Device technology is often used in conjunction with Spectranetics' Laser Sheath, or SLS II, which employs "cool" ultraviolet light known as excimer laser to dissolve the scar tissue binding the leads.

*"Increasingly, lead removal is the best decision for many of my patients when lead issues are encountered. The LLD EZ fits the majority of leads making device selection easy," said Dr. Roger Carrillo, a cardiothoracic surgeon at Mount Sinai Medical Center in Miami. "With the sleek tip design, the LLD EZ simplifies navigation and manipulation."*

(Emphasis added.)

46.     On June 2, 2008, Spectranetics issued a press release entitled, "Spectranetics Announces Closing of Transaction to Acquire Endovascular Business of Kensey Nash." Therein, the Company, in relevant part, stated:

**Spectranetics Corporation today announced it has completed the closing of the transaction to acquire the endovascular business of Kensey Nash and has begun commercialization of the acquired products.**

The products acquired consist of the QuickCat(R) thrombus aspiration catheter, ThromCat(R) thrombectomy device, and SafeCross(R) products used to treat chronic total occlusions (CTO). These products generated sales of $5.1 million during the year ended December 31, 2007.

*John G. Schulte, Spectranetics' President and Chief Executive Officer, stated, "The closing was completed ahead of schedule and integration activities have already been initiated. Training of many of our vascular intervention sales professionals has been completed and we look forward to marketing the acquired products and maximizing their potential with the manufacturing and product development support of Kensey Nash."*

(Emphasis added.)

47.     On June 5, 2008, Spectranetics issued a press release entitled, "Spectranetics Enrolls First Patients in TAAMI Trial; Company Also Encouraged by International Journal of Cardiology

Article Discussing Laser as an Effective Treatment for Acute Myocardial Infarction (AMI)."

Therein, the Company, in relevant part, stated:

> **Spectranetics Corporation (Nasdaq: SPNC) announced today enrollment of the first patients into the TAAMI trial. The TAAMI trial (ThromboAblation in Acute Myocardial Infarction) is a planned 200-patient randomized trial involving major medical centers in Poland. Starting last quarter, TAAMI enrolled its first six patients and recently initiated the fifth participating hospital.**

> The trial comprises two treatment groups and enrolls the most complex AMI patients - those with a large thrombus burden presenting with ST wave elevation myocardial infarction (STEMI). The study group receives excimer laser treatment plus direct stenting. The control group receives balloon angioplasty and stenting. The primary endpoint is a combination of ST resolution, which is resolution of the EKG ST wave elevation injury pattern and the amount of distal embolization as measured by myocardial blush scores.

> *"The TAAMI trial represents an important new opportunity for Spectranetics to evaluate the performance of the excimer laser in these AMI patients," said John G. Schulte, Spectranetics' President and Chief Executive Officer.*

> *The principal investigator of the TAAMI trial, and a leading cardiologist at the Jagiellonian University Medical Center of Krakow, Dariusz Dudek, MD, PhD stated, "This trial will help to assess the effectiveness of laser treatment in conjunction with stenting, and in comparison with a common current combination treatment. I believe this is an important step forward in improving the treatment of patients with AMI."*

> A similar trial conducted in Italy by V. Ambrosini and associates was recently published February 15, 2008 online as an Article in Press of the International Journal of Cardiology. This study describes favorable results seen using the Company's excimer laser to treat 66 patients presenting with AMI complicated by persistent thrombotic occlusion.

> The article titled "Excimer laser in acute myocardial infarction: Single centre experience on 66 patients," concludes that "Laser angioplasty is feasible, safe and effective for the challenging treatment of patients with AMI and thrombus-laden lesions. The acute effects on coronary epicardial and myocardial reperfusion are excellent."

> The trial enrolled patients between May 2003 and October 2006. The primary acute angiographic endpoint was corrected TIMI frame count; the secondary echocardiographic endpoint was left ventricular remodeling defined as an increase

in end-diastolic volume greater than or equal to 20% 6 months after infarction; and the tertiary endpoint was event-free survival at the 6 month follow-up.

According to the article, laser treatment is associated with excellent acute angiographic coronary and myocardial reperfusion as assessed by blush score and corrected TIMI frame count.  The article's authors also observed a relatively high rate of ST segment resolution at 90 minutes after procedure and a low incidence of long-term ventricular remodeling.  Finally, the article noted there was 95% event-free survival at the 6 month follow-up.  However, the authors do point out that further randomized, multicenter controlled trials are warranted in order to assess the benefits of laser angioplasty versus conventional treatment in AMI.

*"We are very encouraged by the results described in the International Journal of Cardiology," said Schulte.  "The endpoints documented in the article are consistent with the clinical goals of the TAAMI trial, and the reported results support our decision to move forward with our own randomized trial."*

(Emphasis added.)

48.      On July 29, 2008, Spectranetics issued a press release entitled, "Spectranetics Second Quarter Revenue up 31% to $26.7 Million, Driven by Solid Performance across All Business Lines; Affirms 2008 Financial Guidance."  Therein, the Company, in relevant part, stated:

Spectranetics Corporation today reported financial results for the quarter and six months ended June 30, 2008.

Revenue for the second quarter of 2008 was $26.7 million, up 31% compared with revenue of $20.4 million for the second quarter of 2007. Disposable product revenue rose 28% to $22.2 million, laser revenue increased 103% to $2.2 million, and service and other revenue increased 19% to $2.3 million, all compared with the second quarter of 2007.  The increase in disposable product revenue was comprised of a 19% increase in vascular intervention (VI) product sales (including atherectomy products and support catheters) and a 52% increase in lead management revenue, compared with the prior-year second quarter.

The worldwide installed base of lasers increased to 800 as of June 30, 2008 (636 in the United States), which included net laser placements of 33 units in the second quarter of 2008, compared with 36 net placements in the second quarter of 2007.

Gross margin for the quarter was 72% of revenue, compared with 75% in the second quarter of the prior year.  This decrease was due primarily to previously announced cost increases associated with an expanded, leased facility and quality assurance to support the growth in our manufacturing volumes. Operating expenses in the quarter were $23.1 million, up 55% from the prior-year second quarter and included $3.8

million in charges for in-process research and development (IPR&D) associated with the recent acquisition of certain endovascular products from Kensey Nash.

The pre-tax loss for the second quarter of 2008 was $3.5 million, inclusive of the $3.8 million IPR&D costs, compared with pre-tax income of $1.0 million for the second quarter of 2007. Given the Company's significant historical net operating losses that are available to offset future taxable income, any income tax expense or benefit is a non-cash item. As a result, management believes that pre-tax income or loss is the most appropriate measure of its operating performance.

For the second quarter of 2008, Spectranetics reported a net loss of $2.6 million, or $0.08 per share, inclusive of the after-tax IPR&D costs of $2.4 million, or $0.07 per share, compared with net income of $7.2 million, or $0.21 per diluted share, in the second quarter of 2007. The second quarter of 2007 includes a $6.6 million income tax benefit associated with establishing a deferred tax asset for the estimated amount of net operating losses expected to be offset with future taxable income.

Cash, cash equivalents and current and non-current investment securities totaled $44.5 million as of June 30, 2008, compared with $54.4 million as of December 31, 2007. During the second quarter of 2008, the Company paid $10.0 million to Kensey Nash upon closing of the acquisition of Kensey Nash's endovascular business.

*"Our strong revenue growth in the face of a challenging economic environment reflects the continuing market acceptance of the value of our laser technology, both in vascular intervention and lead management," said John G. Schulte, President and Chief Executive Officer. "This performance demonstrates the effectiveness of our strategy to invest in product development and clinical studies that support our sales efforts. In addition, with the split of our sales team into separate VI and lead management groups, which we initiated in January, we are now more effectively addressing the growing opportunity in lead management.*

*"We closed the acquisition of Kensey Nash's endovascular business ahead of schedule, and the integration of new products into our sales operation is on track," said Schulte.*

Year-to-Date Financial Results

Revenue for the first half of 2008 rose 34% to $50.5 million, from $37.7 million for the first half of 2007. Year-to-date 2008 disposable product revenue was $42.3 million, up 33% compared with disposable product revenue of $31.8 million in the first half of 2007, and equipment revenue was up 80% to $3.9 million, from $2.2 million in the first half of 2007. Service and other revenue for the first six months of 2008 was $4.4 million, up 15% compared with service and other revenue of $3.8 million for the comparable period in 2007.

Gross margin for the first half of 2008 was 72%, compared with 74% in the first half of 2007, reflecting expected increased costs associated with an expanded, leased facility and quality assurance to support our increased manufacturing volumes.  Operating expenses were $41.5 million, up 48% from $28.2 million for the first half of the prior-year, and inclusive of in-process research charges totaling $3.8 million during the second quarter of 2008.

The pre-tax loss for the first half of 2008 was $4.1 million, inclusive of the $3.8 million IPR&D costs, compared with pre-tax income of $1.2 million in the first half of 2007.  The net loss for the first half of 2008 was $3.0 million, or $0.10 per share, inclusive of after-tax IPR&D costs of $2.4 million, or $0.08 per share, compared with net income of $7.1 million, or $0.21 per diluted share, in the first half of 2007.  Net income for the first half of 2007 includes a $6.6 million income tax benefit associated with establishing a deferred tax asset for the estimated amount of net operating losses expected to be offset with future taxable income.

2008 Financial Guidance

Spectranetics affirms the revenue and pre-tax income guidance for 2008 provided earlier this year, which is repeated herein for reference.  The Company expects revenue for 2008 to be within the range of $104 million to $110 million, representing 25% to 33% growth compared with 2007.

Gross margin for 2008 is expected to be within the range of 72% - 74%.  Research, development and other technology costs are expected to be approximately 14% to 15% of revenue; and selling, general and administrative costs are expected to be within the range of 55% - 58% of revenue. Gross margin and operating expense costs may fall outside of the ranges provided above in any given quarter due to factors that include, but are not limited to, timing of move-related costs associated with the move of our manufacturing operations to an expanded facility, product development costs, clinical trial enrollment rates and expansion of the field sales organization.

Pre-tax income for 2008 is expected to be within the range of $1.0 million to $5.0 million, excluding the $3.8 million of IPR&D costs recorded during the second quarter.  The Company believes that pre-tax income is the most relevant measure of its operating performance given that income taxes are a non-cash expense due to historical net operating losses available to offset future taxable income.  For that reason and the fact that significant fluctuations in the effective income tax rate are expected from quarter to quarter, the Company is not providing guidance on net income.

(Emphasis added.)

    49.    On July 29, 2008, Spectranetics held a conference call with analysts, shareholders and investors to discuss the Company's 2nd Quarter financial results.  The conference call

elaborated on the press release issued that same day.  Defendant Schulte was present and spoke for the Company throughout the call.

50.     In remarks to investors during the call, Defendant Schulte, discussed the Company's financial growth for 2nd Quarter 2008 and stated, in part:

> **Revenue growth in the second quarter continued a very strong top-line growth trend that we demonstrated last quarter. Revenue for the second quarter reached $26.7 million, up 31% over the same quarter in 2007, and representing a sequential growth of 12% over the first quarter.** *Importantly, we saw top-line growth across each of our business lines.*
>
> Disposable revenues grew 28% on a year-over-year basis and 10% sequentially. Within our disposable products lines, our Vascular Intervention, our VI business, was up 19% on a year-over-year basis and 8% sequentially.
>
> * * *
>
> On top of a strong revenue performance, I am very pleased that we also accomplished a number of our strategic initiatives and executed tactically on many fronts.
>
> We successfully closed the acquisition of the Kensey Nash endovascular product lines and completed the transition to Spectranetics by June 1st. Our transition team worked beautifully with our counterparts at Kensey Nash to facilitate what I would call almost a seamless handoff.
>
> We trained our sales force on all products at the end of May and began shipping products through our order entry system the 1st of June. We will transition the manufacturing of the QuickCat aspiration catheters to our new facility before the end of the year.
>
> We've also formed an integrated R&D team to drive the development of the next generation ThromCat and Safe-Cross products. And the development programs are proceeding right on schedule.
>
> I am very excited about the potential for these next generation products and continue to believe these products fit extremely well with the sales focus of our newly dedicated VI sales team.
>
> * * *

On the clinical front, we have three significant studies underway. Two of these studies focus on the treatment of instent re-stenosis or ISR. The first trial called PATENT is being conducted in Germany and is scheduled to enroll 100 patients at up to eight sites. The end point is patency by duplex ultrasound at one year following treatment by the TURBO-Booster and angioplasty. We now have 23 patients enrolled and hope to complete this enrollment within 12 months.

SALVAGE is our second ISR study and this is a multi-center study at up to 12 sites also enrolling 100 patients with basically the same end points as PATENT. This treatment protocol is a little different in that it combines the TURBO-Booster with the Gore Viabahn covered stent.

It is being run independently by the VIVA group of physicians and is being jointly sponsored by Spectranetics and W.L. Gore. We now have 9 of 12 sites up and running and have enrolled 14 patients. We also hope to complete enrollment for SALVAGE within one year.

Our third study is called Tammy. This is a randomized trial and is being conducted at five hospitals in Poland and will treat 200 patients with an Acute Myocardial Infarction or AMI. 100 patients will be treated with the laser to first ablate thrombus followed by direct stenting.

The other group will receive standard PTCA and then stenting. End points or resolution of ST elevation, which is the EKG abnormalities, combined with a measure of distal embolization as measured by myocardial blush scores angiographically. We now have five sites enrolling and have 13 patients enrolled.

(Emphasis added.)

51.     On August 11, 2008, Spectranetics filed its Quarterly Report with the SEC on Form 10-Q.  The Company's 10-Q was signed by Individual Defendant Schulte, and reaffirmed the Company's financial results previously announced on July 29, 2008.  The Company's 10-Q also contained Sarbanes-Oxley required certifications signed by Individual Defendant Schulte, substantially similar to the certifications contained in ¶28, *supra.*

52.     On August 13, 2008, Spectranetics issued a press release entitled, "Spectranetics Takes Steps Targeted at Accelerating Vascular Intervention Growth; Promotes Sales VP with Proven Track Record, Streamlines Organization and Renews Focus on New Product Development." Therein, the Company, in relevant part, stated:

**Spectranetics Corporation (Nasdaq: SPNC) today announced several organizational changes within its vascular intervention (VI) business designed to strengthen its leadership team, streamline the sales management organization, and focus on new product development.**

These changes will result in Jennifer Vaughan assuming the role of Vice President of Sales - VI. Ms. Vaughan was previously the Vice President of Sales - LM (Lead Management), where she was instrumental in delivering year-over-year sales growth at or above 45% in each of the last three quarters. She will report to Mike Voss, the Company's recently announced Vice President and General Manager - VI. Ms. Vaughan will be replaced by Renee Boehme, who previously served as a Regional Manager within the LM business unit. Ms. Boehme will become Director of Sales - LM and will report to Jason Hein, Vice President and General Manager - LM. Steve Okland, the previous Vice President of U.S. Sales - VI has elected to leave the Company to pursue other career opportunities.

The Company has also eliminated the Sales Director - VI position in order to flatten the sales management organization and enable Ms. Vaughan to work more closely with the Regional Managers that were previously reporting to two Sales Directors.

*John Schulte, President and CEO of Spectranetics, commented, "I would like to thank Steve Okland for his significant contributions to the growth in our business during the last few years. Under his leadership and direction, our sales organization in the United States has expanded from 55 sales professionals when he joined the Company to its current level of 110 sales professionals.*

*"I'm very pleased to announce our new vascular-intervention leadership team. Mike's demonstrated leadership, particularly within marketing and product development, combined with Jennifer's sales-management abilities are ideally suited to lead our vascular-intervention business. Although we have continuing confidence in the strength of our vascular-intervention business, which has grown 28% through the first half of the year compared with the same period last year, we are particularly disappointed with sales of our TURBO-Booster(TM) product. We plan to address this with continuing sales focus under a strengthened sales-management team, as well as new product-development programs. We are in the early design phase of the next-generation TURBO-Booster(TM) and also are developing a new product to extend our QuickCross support catheter product line, which has been a growth driver within the vascular intervention business over the last several years. Lastly, we are steadfast in our commitment to sustained profitability as evidenced by the streamlining of our sales management structure. Further, we have taken additional steps to moderate growth in selling, general and administrative expenses during the second half of the year without compromising our ability to grow revenue."*

(Emphasis added.)

41

53.     On August 27, 2008, Spectranetics issued a press release entitled, "Spectranetics Announces First Laser Lead Extraction Procedures in Japan." Therein, the Company, in relevant part, stated:

> Spectranetics Corporation (Nasdaq: SPNC) today announced the first use in Japan of its Spectranetics Laser Sheath (SLS(R) II) technology for removal of cardiac leads. The SLS II approval by the Ministry of Health, Labor and Welfare is one of just three medical device technologies chosen annually under a fast track review in Japan. This technology has been used in the United States and Europe for over a decade in over 45,000 successful procedures and is an important tool to manage lead-related issues that may arise in the roughly 4 million pacing and defibrillation leads implanted annually in patients worldwide.
>
> **Two procedures were recently performed at Tokyo Women's Medical University by Dr. Morio Shoda, Chief of Clinical Cardiac Electrophysiology and Associate Professor of Cardiology, and Dr. Satoshi Saito, Assistant Professor of Cardiovascular Surgery, under the proctorship of Dr. Roger Carrillo, the Director of Surgical Electrophysio logy at the University of Miami. Both cases involved leads that were infected, and all leads were successfully removed from the heart and encapsulating scar tissue using the SLS II Laser sheath without complication.**
>
> **Dr. Shoda commented, "I am very pleased to begin using the SLS II Laser Sheath to remove leads from Japanese patients for whom this form of management is needed. Now in Japan we can safely address the needs of many patients with implantable pacemakers and defibrillators without subjecting them to more invasive surgical procedures."**
>
> **Dr. Roger Carrillo added, "In my years of experience with lead extraction procedures, the laser sheath is an indispensable tool that has helped me remove leads in a very safe, effective and efficient manner in hundreds of patients. In this first case in Japan, the laser sheath was successful in extracting a chronic lead where all other techniques had previously failed."**
>
> ***"Japan is an important market for Spectranetics and the recent fast track approval for our SLS II Laser Sheath is a key first step towards commercialization in Japan, supported by our distribution partner, DVx Japan. We will launch this technology commercially following reimbursement approval for the SLS II, which is currently under review by Japan's Ministry of Health, Labor and Welfare," stated John Schulte, Spectranetics' chief executive officer.***
>
> As an escalating number of patients receive implanted cardiac devices, concerns surrounding lead management options have risen. Infection continues to be a

> primary cause for concern with leads, although lead malfunction and patient lifespan are increasingly causing physicians to consider lead removal versus lead abandonment, the current standard-of-care practice.
>
> The SLS II uses "cool" ultraviolet light to safely, effectively and efficiently ablate scar tissue that holds problematic leads in place.  A circle of fibers that emit pulses of energy travels over the cardiac lead to dissolve scar tissue that binds the lead to the body.  Once the scar tissue is dissolved, the lead can be safely removed. Spectranetics is also in the process of seeking approval of the Lead Locking Device (LLD) technology in Japan, which can be used to assist removal with the SLS II by transmitting traction on the lead from within its hollow inner structure.

(Emphasis added.)

54.     The statements contained in ¶¶25-53 were materially false and/or misleading when made because defendants failed to disclose or indicate the following: (1) that the Company lacked effective compliance controls; (2) that the Company was illegally and extensively marketing its laser and catheters for uses that had not been approved by the FDA; (3) that the Company failed to report to the FDA that tests found its laser caused significant damage to stents it was using in the clinical trial; (4) that the Company illegally tested several products on patients without FDA approval; (5) that the Company lacked effective internal controls; and (6) as a result of the above, the Company's financial results were materially inflated.

## Disclosures at the End of the Class Period

55.     On September 4, 2008, Spectranetics issued a press release shocking its shareholders and the market by announcing a "Federal Investigation."  As noted earlier, the Company, in relevant part, stated:

> Spectranetics Corporation was jointly served by the Food and Drug Administration (FDA) and U.S. Immigration and Customs Enforcement (ICE) this morning with a search warrant issued by the United States District Court, District of Colorado.
>
> The search warrant requested information and correspondence relating to: (i) the promotion, use, testing, marketing and sales regarding certain of the company's products for the treatment of in-stent restenosis, payments made to medical personnel and an identified institution for this application, (ii) the promotion, use, testing,

experimentation, delivery, marketing and sales of catheter guidewires and balloon catheters manufactured by certain third parties outside of the United States, (iii) two post-market studies completed during the period from 2002 to 2005 and payments to medical personnel in connection with those studies, and (iv) compensation packages for certain of the company's personnel.

56.    On this news, NASDAQ subsequently halted trading of shares in Spectranetics, but only after Company shares had already fallen $4.27 per share, or 47%, to $4.73 per share on abnormally heavy trading volume.  The Company has given no explanation about the severe price drop before the trading halt or advised the public who was selling shares prior to the trading halt.  The following day on September 5, 2008, shares of Spectranetics were allowed to resume trading and closed at $5.63 per share, a decline of $3.37 per share, or 37%, from the September 3, 2008 closing price of $9.00 per share.

57.    On September 5, 2008, the Associated Press issued a press release entitled, "Ahead of the Bell: Spectranetics: Analysts seek details of US Investigation of Spectranetics; Stock Rebounds PreMarket."  Therein, the press release, in relevant part, stated:

> Charles Chon of Goldman Sachs said the investigation could cause changes in sales or marketing that hamper Spectranetics' competitiveness or lead to greater spending, disrupt product supplies or cause key company personnel to leave. Lawsuits, fines or penalties could also result, he said, although he added that it is too early to determine the outcomes of the investigation.

58.    On September 15, 2008, the Company issued a press release entitled, "Spectranetics Provides Update on VIVA II: SALVAGE Trial."  Therein, the Company, in relevant part, stated:

> As previously announced on February 28, 2008, the SALVAGE trial is a prospective, multicenter trial to evaluate the safety and performance of Spectranetics' laser and certain other products for the treatment of in-stent restenosis (ISR) within nitinol stents implanted in the superficial femoral artery (SFA). It is a physician-sponsored investigational device exemption study in the United States that is run by VIVA Physicians, Inc.

44

*To date, 25 of the planned 100 patients with ISR in the SFA have been enrolled. VIVA has elected to temporarily suspend enrollment in the study after being contacted by the Food and Drug Administration (FDA) about a potential safety concern relating to the laser device. Spectranetics believes the potential concern relates to laser interaction with nitinol stents.*

* * *

"We respect the decision by VIVA to take a conservative approach with this study and look forward to the results of the FDA's review of the safety data we just submitted related to laser interaction with nitinol stents. To be clear, this decision by VIVA does not reflect or speak to our products when used for labeled or cleared indications," said John G. Schulte, President and Chief Executive Officer of Spectranetics. "We are continuing to work closely with the FDA to provide all the information necessary so that the physician investigators can resume enrollment in the SALVAGE study."

(Emphasis added.)

59.     In response to the Company's press release on September 15, 2008, the Associated Press issued a press release entitled, "Enrollment Halted in Trial of Spectranetics Laser with Nitinol Stents due to Safety Concerns." Therein, the Associated Press, stated:

**A physicians group running a study of the use of Spectranetics Corp.'s lasers with nitinol stents has voluntarily stopped enrollment in the study to address safety concerns, the company said Monday.**

**Spectranetics said VIVA Physicians Inc. made the decision to halt enrollment in the Salvage trial after the Food and Drug Administration contacted it about potential safety concerns. About 25 of a planned 100 patients had been enrolled.**

Spectranetics said it had submitted safety data to the FDA showing that stents could withstand its laser method for treating restenosis, which is the closing of arteries after a stent has been inserted. Stents are mesh tubes that prop open arteries.

"We are continuing to work closely with the FDA to provide all the information necessary so that the physician investigators can resume enrollment in the Salvage study," the company said in a statement.

*Spectranetics shares fell 26 cents, or 6 percent, to $4 in after-hours trading. The stock fell 8 percent to $4.26 in the regular session Monday.*

45

(Emphasis added.)

60.     On September 19, 2008, Spectranetics disclosed that it was sued by its former Director of Marketing who alleges he was fired after bringing facts of alleged illegal marketing of the Company's lasers and stents to senior managements' attention.  The lawsuit alleges the former Director of Marketing discovered the Company was illegally and "extensively" marketing its laser and catheters for uses that had not been approved by the FDA; that the Company failed to report to the FDA that tests found its laser "caused significant damage" to stents the Company was using in the clinical trial; and that the Company illegally tested several products on patients without FDA approval.  Furthermore, the former Director of Marketing alleges that he notified Defendant Schulte of Spectranetics' alleged violations in an email dated April 1, 2008.

61.     On September 25, 2008, after the whistleblower action was filed, Spectranetics announced the Company received a request for information from the SEC's Denver office.

62.     As now revealed, the Company's earnings press releases, as well as its SEC filings portraying strong financial results and adequate internal financial controls, were materially false and misleading. As a result of these materially false and misleading statements and failures to disclose material facts, Individual Defendants' knew or should have known that Spectranetics' common stock traded at artificially inflated prices during the Relevant Period and that the Company was becoming subject to regulatory actions and lawsuits.  Defendants unquestionably breached their fiduciary duties owed to the Company and failed to adequately supervise, manage or control the affairs of the Company.

## DEMAND WOULD BE FUTILE

63.     Each of the Director Defendants face a substantial likelihood of liability in this action because of his failure, as a director, to assure that reliable systems of financial controls and information and reporting were in place and functioning effectively.   The dramatic breakdowns and gaps in those controls were so widespread and systematic that each of the Director Defendants face substantial exposure to liability for their total abrogation of their duty of oversight.

64.     Each of these Directors knew or should have known that their public statements in press releases and SEC filings were materially false and misleading as alleged above.   Each Director knew that such statements or documents would be issued or disseminated to the investing public and they knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents.   Each Director knew or should have known that the Company lacked adequate internal controls.   Defendant Directors took no steps in good faith to prevent or remedy the situation.   Therefore, any demand on the Director Defendants would have been futile.

65.     Each of the Director Defendants signed reports filed with the SEC containing false financial information concerning the Company - - David Blackburn (FY:2008),[3] R. John Fletcher (FY:2008), Emile Geisenheimer (FY:2008), Martin Hart (FY:2008), Joseph Ruggio (FY:2008), John Schulte (FY:2007-FY:2008), and Craig Walker (FY:2008) - - and face a sufficiently substantial likelihood of liability for same.   Therefore, any demand on the Director Defendants would have been futile.

---

[3] "FY" refers to the fiscal year in which the misleading SEC report was filed.

66.    At times relevant hereto, Director Defendant John Schulte personally participated in, and approved with his signature, the issuance of false and/or misleading statements in press releases issued to the public and filed with the SEC.  Defendant Schulte also participated in conference calls with analysts and shareholders that disseminated false and/or misleading information. As a result, Schulte faces a sufficiently substantial likelihood of being held liable for same.  Accordingly, any demand upon him would be futile.

67.    In addition, Director Defendant John Schulte is exposed to potential liability in this action because of his complete failure to put in place appropriate systems of financial reporting, and information and legal compliance controls to assure the accuracy of financial and other information disclosed by the Company to the public and thereby prevent the dissemination of false and misleading information to the public.

68.    Plaintiff brings this action derivatively in the right and for the benefit of Spectranetics to redress injuries suffered and to be suffered by Spectranetics as a result of the breaches of fiduciary duty by the Individual Defendants.  This is not a collusive action to confer jurisdiction on this Court which it would not otherwise have.

69.    Plaintiff will adequately and fairly represent the interests of Spectranetics and its shareholders in enforcing and prosecuting its rights.

70.    Plaintiff is a current owner of Spectranetics common stock and owned Spectranetics common stock during the time period in which the Individual Defendants' wrongful course of conduct alleged herein was occurring through the present.

71.    Plaintiff did not make a demand on Spectranetics Board to bring the claims alleged herein because such a demand would have been futile.  At the time this derivative action was commenced, and presently, Spectranetics' Board consisted and consists of seven members:

David G. Blackburn (member of the Audit, Compensation and Nominating and Corporate Governance Committees), R. John Fletcher (Chairman of the Compensation and Nominating and Corporate Governance Committees), Emile J. Geisenheimer (Chairman of the Board and member of the Audit and Compensation Committees), Martin T. Hart (Chairman of the Audit Committee and member of the Nominating and Corporate Governance Committee), Joseph M. Ruggio, M.D., John G. Schulte (President and CEO), and Craig M. Walker, M.D.  Each of these Board members has been named as a defendant in this action.  In addition, John Schulte has been named as a defendant in multiple securities class action lawsuits.  As detailed below, each of the directors face a substantial likelihood of liability on the derivative claims alleged herein and are therefore in no position to render a disinterested judgment as to whether the Company should bring such claims, and/or lacks sufficient independence with which to render a disinterested decision on whether to pursue the derivative claims against the Individual Defendants.

**Additional Likelihood of Substantial Liability for the Audit and Compensation Committee Defendants**

72.     According to Spectranetics' Proxy Statements filed with the SEC on or about April 29, 2008 and April 30, 2007, Defendants Hart (Chairman), Geisenheimer and Blackburn were, at times relevant hereto, members of the Audit Committee of the Company's Board.  The Audit Committee is responsible, by its Charter, for reviewing and discussing, with management and the independent auditors, Spectranetics' earnings releases.  The Audit Committee is also responsible for discussing Spectranetics' internal audit function and reviewing reports concerning the Company's design operation of internal controls.  Thus, the Audit Committee was responsible for overseeing and directly participating in Spectranetics' financial reporting process.  Accordingly, Defendants Hart, Geisenheimer and Blackburn breached their fiduciary duties of

due care, loyalty and good faith because the Audit Committee participated in the preparation of earnings press releases that contained false and/or misleading material information. Further, Spectranetics' deficient internal control structure allowed the Company to issue false financial statements for the years ending 1997, through the third quarter 2008. Particularly, these defendants reviewed and failed to correct Spectranetics' improper earnings releases between April 19, 2007 and August 27, 2008 and its financial statements for years ending 2007 through the third quarter 2008. The Audit Committee members either knew or should have known of the financial misrepresentations described above, given their size, scope and blatancy. Such conduct is not protected by the business judgment rule. As a result of these transgressions, Defendants face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

73.    Defendant Hart has also been classified by the Board as an audit committee "financial expert" as the term is defined in the SEC's rules and regulations. In light of this, and in light of his position as Chairman of the Audit Committee, Defendant Hart faces an even greater likelihood of substantial liability as the manipulations and misrepresentations took place under his expert eye. As a result, Defendant Hart faces a substantial likelihood of liability for his breach of fiduciary duties and any demand upon him is futile.

74.    Director Defendants Fletcher (Chairman), Geisenheimer, and Blackburn are further exposed to liability because of their membership on the Compensation Committee. In these positions they approved compensation and finance plans for senior executives and directors, pursuant to which millions of dollars were paid out by the Company based on financial results that have turned out to be based on misleading information and were materially inflated. The Compensation Committee members either knew or should have known of the financial

misrepresentations described above, given their size, scope and blatancy.   As a result these defendants face a sufficiently substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

### The Members of the Board of Directors Lack Independence

75.   Director Defendant John Schulte is the Company's current CEO and President. His principal occupation is his employment with Spectranetics.  For the years 2007 and 2006, the Company paid John Schulte $384,231 and $355,192, respectively, in base salary.  In addition, Defendant Schulte was given option awards valued at $36,268 in 2007 and $272,877 in 2006.  In 2007 and 2006, he was provided with incentive compensations of $172,850 and $242,034, respectively.  He also received "other" compensations of $9,750 in 2007, and $16,913 in 2006.  In total, from 2006 to 2007, Defendant Schulte received $1,490,115 in compensation.  Because of his employment with Spectranetics, Defendant Schulte is beholden to the Company and lacks the sufficient independence needed to render a disinterested decision on whether to pursue the Derivative Claims against the Individual Defendants.

76.   On April 1, 2008, Director Defendant John Schulte was directly notified of the violations alleged herein through an email sent to him by the former Director of Marketing and he failed to appropriately act and/or respond to prevent further harm done to the Company.  Because of his direct notification of the violations alleged herein, Defendant Schulte lacks the sufficient independence needed to render a disinterested decision on whether to pursue the Derivative Claims against the Individual Defendants.

77.   Directors Hart, Geisenheimer and Blackburn are members of the Board's Audit Committee, and so, as described above, lack the sufficient independence needed to render a

disinterested decision on whether to pursue the Derivative Claims against the Individual Defendants.

78.     Directors Fletcher, Geisenheimer, and Blackburn are members of the Board's Compensation Committee.  In those positions they approved compensation and finance plans for senior executives and directors, pursuant to which millions of dollars were paid by the Company to executives and employees based on grossly inflated financial results.  In addition, stock options were awarded by the Compensation Committee to the Board of Directors that will potentially allow them to profit from the wrongful acts they were charged to prevent. Directors Fletcher, Geisenheimer, and Blackburn have not yet demanded or received on behalf of the Company compensation paid based upon false financial results.  Instead they have permitted the Directors, executives and employees to retain their ill gotten gains.  As a result, these Directors lack the sufficient independence needed to render a disinterested decision on whether to pursue the Derivative Claims against the Individual Defendants.

79.     Director Defendant Craig Walker, M.D. was hired by Spectranetics in 2007, to conduct training with outside physicians in the use of the Company's Excimer laser.  He also provides consulting services and moderates the Company's laser training courses and seminars. Per his agreement with the Company, Defendant Walker received $144,000 in 2007 for providing these services.  Because of his professional relationship with, and additional compensation by, Spectranetics, Defendant Walker lacks sufficient independence with which to render a disinterested decision on whether to pursue Derivative Claims against the Individual Defendants.

80.     Director Defendant Joseph M. Ruggio, M.D. entered a Patent Purchase Agreement with the Company in 2007.  Under the agreement, the Company paid Defendant Ruggio $150,000 upon execution of the agreement and continues to pay Defendant Ruggio 2% on

net revenue received by the Company from sales of the products that make use of one or more of the inventions covered by the Patent. The Company's increased sales through the wrongful acts further described herein directly benefit Defendant Ruggio through potentially higher payments per his agreement. Due to Defendant Ruggio's interrelated business relationships with, and additional compensation by, Spectranetics, he lacks sufficient independence with which to render a disinterested decision on whether to pursue Derivative Claims against the Individual Defendants.

81.     Director Defendant Emile Geisenheimer has been a member of the Spectranetics Board since 1996. He served as the Company's acting President and CEO from May 2002 through January 2003. Over the course of his tenure on the Company's Board of Directors, he has been paid large fees and granted options in return for undisclosed and unidentified "consulting services." From 1996 to 2004, Director Defendant Geisenheimer received approximately $953,333 in cash payments and was granted stock options to purchase 150,000 shares of stock as a result of his consulting agreement with Spectranetics. Due to Defendant Geisenheimer's interrelated business relationships with, and additional compensation by, Spectranetics which is tied directly to the Company maintaining a high stock price until he sells his stock options, he lacks sufficient independence with which to render a disinterested decision on whether to pursue Derivative Claims against the Individual Defendants.

82.     Due to Defendant Geisenheimer's influence and control over the Board, as demonstrated by the ousting of former Spectranetics CEO Joseph Largey, the entire Board lacks sufficient independence with which to render a disinterested decision on whether to pursue Derivative Claims against the Individual Defendants. In May 2002, Steven Sweet, a company shareholder, solicited proxies to replace Defendants Geisenheimer and Schulte. At the time,

Schulte was a Director of the Company only.  Sweet alleged that Geisenheimer received excessive amounts of Company stock and received hundreds of thousands of dollars in consulting fees despite the Company's poor performance.  Sweet sought to replace Geisenheimer because of the excessive stock options and cash payments made to him for consulting work.  Sweet also sought to replace Schulte because he was Geisenheimer's main supporter on the Board of Directors, further demonstrating the Defendants' interdependence.  Spectranetics then CEO Joseph Largey and then CFO Paul Samek both publicly supported Sweet's proxy attempt.  Several days after Joseph Largey and Paul Samek both publicly announced their intentions to back Sweet's proxy, Geisenheimer led the Board of Directors, including Defendant Directors Fletcher, Ruggio and Schulte, to release Joseph Largey and Paul Samek.  In January 2003, Defendant Schulte was rewarded for his loyalty to Geisenheimer by being named as Spectranetics President and CEO.  Thus, because Defendant Geisenheimer controls and dominates the Company and its Board, demand upon the Board to bring legal action against the Individual Defendants would be futile.

83.     Director Defendant Martin Hart served as Chairman of Corechange, Inc.'s Board of Directors from 1998 until they were sold to Open Text, Inc. in 2003.  He was also a member of Corechange's Audit Committee.  Director Defendant Schulte was the President of the Surgical Products Division of Genzyme Corporation from July 1997 to October 1998.  In 1997, Corechange entered into an agreement with Genzyme to provide them their Livelink ECM business management software.  Open Text, Inc., Corechange's parent company, continues to provide this service to Genzyme.  Through the interaction of Genzyme and Corechange, which took place while Defendants Schulte and Hart were serving these companies respectively, Defendants Schulte and Hart have developed interrelated business, professional and personal relationships that have continued for at least ten years.  Because of this interlocking business

relationship and debilitating conflict of interest, Defendants Schulte and Hart lack sufficient independence with which to render a disinterested decision on whether to pursue Derivative Claims against each other or any of the other Individual Defendants.

84.     Spectranetics has expended and will continue to expend significant sums of money as a result of the illegal and improper actions described above.  Such expenditures will include, but are not limited to:

  a.     Costs incurred to carry out internal investigations, including legal fees paid to outside counsel, accounting firms and consultants;

  b.     Costs related to the current FDA, ICE and SEC investigations;

  c.     Costs incurred from potential fines in connection with governmental investigations; and

  d.     Audit fees and expenses and loss of goodwill.

85.     In addition, demand would be a futile and useless for the following reasons:

  a.     Defendants Schulte and Walker are not independent directors of Spectranetics.  Schulte and Walker are beholden to the Company because of their employee status.  Demand upon Schulte and Walker would be futile.

  b.     Defendant Ruggio is not an independent director.  Ruggio is beholden to the Company because of his agreement to sell a patent to Spectranetics which continues to pay him 2% of the net profits derived from his inventions and because he has earned greater compensation from the products that may be linked to the wrongful acts alleged herein.  Demand upon Ruggio would be futile.

  c.     Defendant Geisenheimer is not an independent director.  He is beholden to the Company because of hundreds of thousands of dollars in cash and grant options he received from the Company for "consulting services."  Geisenheimer is also hostile to maintaining a fully independent Board as demonstrated by his actions to replace dissenting management.  Demand upon Geisenheimer would be futile.

  d.     Defendant Hart is not an independent director of Spectranetics.  He was Chairman of the Board of Corechange when they were given a contract by Genzyne for consulting and software.  John Schulte was the President of

Genzyme during the time period the two corporations were associated. Because of this relationship and as further alleged herein, demand upon Defendants Hart and Schulte would be futile.

e.      The Director Defendants of Spectranetics, as more fully detailed herein, approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise these wrongs from Spectranetics shareholders or recklessly and/or negligently disregarded the wrongs complained herein, and are therefore not disinterested parties. Each of the Director Defendants exhibited a sustained and systematic failure to fulfill their fiduciary duties, which could not have been an exercise of good faith business judgment and amounted to gross negligence and extreme recklessness.

f.      In order to bring this suit, the Directors of Spectranetics would be forced to sue themselves and persons with whom they have extensive business and personal entanglements, which they will not do, thereby excusing demand.

g.      The acts complained of constitute violations of the fiduciary duties owed by Spectranetics officers and directors and these acts are incapable of ratification.

h.      Spectranetics has been, and will continue to be, exposed to significant losses due to the wrongdoing complained of herein, yet the Individual and Director Defendants and current Board have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Spectranetics any part of the damages the Company has suffered and will continue to suffer.

i.      The actions of the directors has impaired the Board's ability to validly exercise its business judgment and rendered it incapable of reaching an independent decision as to whether to accept Plaintiff's demands.

j.      Any suit by the directors of Spectranetics to remedy these wrongs would likely expose the Director Defendants and Spectranetics to further violations of securities laws which could result in additional civil actions being filed against one or more of the Director Defendants.  In light of this, they are hopelessly conflicted in making any supposedly independent determination as to whether to sue themselves.

86.     Plaintiff has not made demand on the shareholders of Spectranetics to institute this action since demand would be a futile and a wasteful act for the following reasons:

a.    Spectranetics is a publicly held company with approximately 31.9 million shares outstanding and thousands of shareholders;

b.    Making demand on such a number of shareholders would be impossible for Plaintiff, who has no way of finding out the names, addresses or phone numbers of all the shareholders; and

**c.**    Making demand on all shareholders would force Plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

## FIRST CAUSE OF ACTION

### Against Individual Defendants for Breach of Fiduciary Duty

87.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as if set forth full herein.

88.    The Individual Defendants owed and owe Spectranetics fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe Spectranetics the highest obligation of good faith, fair dealing, loyalty and due care.

89.    The Individual Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

90.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent the financial condition of the Company and failed to correct the Company's publicly reported financial results and guidance. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

91.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Spectranetics has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

92.    Plaintiff, on behalf of Spectranetics, has no adequate remedy at law.

## SECOND CAUSE OF ACTION

### Against The Individual Defendants for Abuse of Control

93.     Plaintiff incorporates by reference and realleges each and every allegation set forth above as if set forth fully herein.

94.     The Individuals Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Spectranetics, for which they are legally responsible.

95.     As a direct and proximate result of the Individual Defendants' abuse of control, Spectranetics has sustained significant damages.

96.     As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

97.     Plaintiff, on behalf of Spectranetics, has no adequate remedy at law.

## THIRD CAUSE OF ACTION

### Against the Individual Defendants for Gross Mismanagement

98.     Plaintiff incorporates by reference and realleges each and every allegation set forth above as if set forth fully herein.

99.     By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Spectranetics in a manner consistent with the operations of a publicly held corporation.

100.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Spectranetics has sustained significant damages in excess of millions of dollars.

101.    Plaintiff, on behalf on Spectranetics, has no adequate remedy at law.

## FOURTH CAUSE OF ACTION

### Against the Individual Defendants for Waste of Corporate Assets

102.     Plaintiff incorporates by reference and realleges each and every allegation set forth above as if set forth fully herein.

103.     As result of the Individual Defendants' improper conduct and by failing to properly consider the interests of the Company and its public shareholders by failing to conduct proper supervision, Individual Defendants have caused Spectranetics to waste valuable corporate assets by paying bonuses to certain of its executive officers and incur potentially millions of dollars of legal liability and/or legal costs to defend the Individual Defendants' unlawful actions.

104.     As a result of the waste of corporate assets, Individual Defendants are liable to the Company.

105.     Plaintiff, on behalf of Spectranetics, has no adequate remedy at law.

## FIFTH CAUSE OF ACTION

### Against the Individual Director Defendants for Unjust Enrichment

106.     Plaintiff incorporates by reference and realleges each and every allegation set forth above as if set forth fully herein.

107.     By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Spectranetics.

108.     Plaintiff, as a shareholder and representative of Spectranetics, seeks restitution from the Individual Defendants, and seeks an order from this Court disgorging all profits, benefits and other compensation obtained by the Individual Defendants, from their wrongful conduct and fiduciary breaches.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment as follows:

A.      Against the Individual and Director Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual and Director Defendants' breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment;

B.      Extraordinary equitable and/or injunctive relief as permitted by law, equity and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on or otherwise restricting the proceeds of the Individual Director Defendants' trading activities or their other assets so as to ensure that Plaintiff has an effective remedy;

C.      Awarding to Spectranetics restitution from the Individual and Director Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by these Defendants;

D.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorney's fees, accountants' and experts' fees, costs, and expenses; and

E.      Granting such other and further relief as the Court deems just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff demands a trial by jury.

DATED: September 29, 2008                    Respectfully Submitted,


s/ Gerald L. Bader


_____
Gerald L. Bader
Renee B. Taylor

60

BADER & ASSOCIATES, LLC
1873 S. Bellaire, Suite 1110
Denver, CO  80222
Phone:  (303) 534-1700
Fax:  (303) 691-5076
*gbader@bader-associates.com*
*rbtaylor@Bader-Associates.com*

William B. Federman
FEDERMAN & SHERWOOD
10205 N. Pennsylvania Ave.
Oklahoma City, OK  73120
Phone:  (405) 235-1560
Fax:  (405) 239-2112
*wfederman@aol.com*

Counsel for Plaintiff